**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stephanie Mueller,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Car Wash Partners Incorporated,<br><br>　　　　　Defendant. | No. CV-20-00045-TUC-JCH<br><br>**ORDER** |

Plaintiff Stephanie Mueller ("Mueller") alleges that Defendant Car Wash Partners Incorporated ("CWP") terminated her employment because she was pregnant, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Pregnancy Discrimination Act. (Doc. 1.) Pending before the Court is CWP's Motion for Summary Judgment ("Motion") (Doc. 51), which is fully briefed (Docs. 57, 60). For the following reasons, the Court will deny the Motion.[1]

**I.   Facts**[2]

CWP is a national car wash company headquartered in Tucson, Arizona. (Doc. 52 at 1 ¶ 2; Doc. 58 at 11 ¶ 2.) CWP's written policies prohibit unlawful discrimination of any kind, including discrimination on the basis of gender or pregnancy. (Doc. 52 at 2 ¶ 7; Doc. 58 at 11 ¶ 7; *see also* Doc. 52-6 at 2.) CWP distributes its employment policies, including its anti-discrimination policy, to all its employees. (Doc. 52 at 2-3 ¶ 8; Doc. 58

---

[1] The Court finds that the Motion is suitable for resolution without oral argument pursuant to LRCiv 7.2(f).
[2] Unless otherwise noted, the facts recited herein are undisputed. All record citations refer to the page numbers generated by the Court's electronic filing system.

at 11 ¶ 8.)

In mid-2017, CWP's Chief Executive Officer John Lai ("Lai") reached out to Mueller to discuss employment opportunities with the company. (Doc. 52 at 3 ¶ 10; Doc. 58 at 1-2 ¶ 1; Doc. 58 at 11 ¶ 10.) Over the next several months, Lai, Vice President of Operations Services Mayra Chimienti ("Chimienti"), and now-Vice President of Planning and Development Sarah Ross ("Ross") met with Mueller to get to know her and discuss CWP. (Doc. 52 at 3-4 ¶ 11; Doc. 58 at 2 ¶ 2; Doc. 58 at 11 ¶ 11; *see also* Doc. 52-2 at 2 ¶ 3; Doc. 52-9 at 2 ¶ 3.) The parties dispute whether Chimienti asked, during one of their pre-employment conversations, if Mueller planned to have another baby. (Doc. 58 at 2 ¶ 3; Doc. 52-4 at 21; *see also* Doc. 52-10 at 13-14; Doc. 58-1 at 6; Doc. 58-3 at 9.)

CWP's leadership determined that Mueller would be a good addition to CWP's corporate office given her experience and the positive attitude and enthusiastic demeanor she displayed during the pre-employment interviews. (Doc. 52 at 5 ¶ 18; Doc. 58 at 2 ¶¶ 2, 4; Doc. 58 at 12 ¶ 18.) On November 6, 2017, CWP hired Mueller as an Integration Services Support Specialist under the supervision of Ross. (Doc. 52 at 5 ¶ 18; Doc. 58 at 2 ¶ 5; Doc. 58 at 12 ¶ 18.) Mueller received a copy of CWP's employment policies in February 2018. (Doc. 52 at 2-3 ¶ 8; Doc. 58 at 11 ¶ 8.) At all times, Mueller's employment with CWP was at-will. (Doc. 52 at 5 ¶ 19; Doc. 58 at 12 ¶ 19.)

As an Integration Services Support Specialist, Mueller was responsible for supporting the integration of newly acquired car washes. (Doc. 52 at 5-6 ¶¶ 20-21; Doc. 58 at 12 ¶¶ 20-21.) Soon after Mueller joined CWP, the company's acquisition of other companies slowed due to market reasons and Mueller's integration-related work was less than expected. (Doc. 52 at 6 ¶ 22; Doc. 58 at 2-3 ¶ 8; Doc. 58 at 12 ¶ 22.) There were no new acquisitions during the first nine months of Mueller's employment with CWP and Mueller worked on projects from other departments instead of the integration-related work for which she had been hired. (Doc. 52 at 6 ¶ 22; Doc. 58 at 2-3 ¶ 8; Doc. 58 at 12 ¶ 22.) The parties dispute whether Mueller was unhappy with her job, but it is undisputed that she felt underutilized and told Ross and Lai that she wanted to do more for CWP. (Doc. 52 at

6-7 ¶¶ 23-26; Doc. 58 at 12 ¶¶ 23-26; *see also* Doc. 52-9 at 3-4; Doc. 52-10 at 23, 25-26; Doc. 58-1 at 8-10.)

In August 2018, Chimienti took Mueller to lunch to discuss transferring her to an Operations Services Specialist position in which Mueller would support regional managers throughout the country and write a weekly newsletter, "the Ops Connect," for distribution to field leadership. (Doc. 52 at 7-8 ¶¶ 28-30; Doc. 58 at 13 ¶ 28-30.) Chimienti asked Mueller to think carefully before taking the position because Chimienti did not want Mueller to be unhappy on the Operations Services team. (Doc. 52 at 9 ¶ 32; Doc. 58 at 13 ¶ 32.)

Mueller accepted the Operations Services Specialist position on or about August 10, 2018, under the supervision of Chimienti, and worked in that position until CWP terminated her employment on February 6, 2019, about six months later. (Doc. 52 at 9 ¶¶ 35-36; Doc. 58 at 3 ¶ 11; Doc. 58 at 13 ¶¶ 35-36.) In December 2018, CWP hired Patricia Bohardt ("Bohardt")[3] as a second Operations Services Specialist and as Mueller's counterpart. (Doc. 52 at 14 ¶¶ 49, 51; Doc. 58 at 17-18 ¶¶ 49, 51.) Together, Mueller and Bohardt shared the duties and responsibilities of supporting CWP's six national divisions. (Doc. 52 at 14 ¶¶ 49, 51; Doc. 58 at 17-18 ¶¶ 49, 51.)

The parties dispute whether there were problems with Mueller's job performance, engagement, and demeanor. (Doc. 52 at 10-17, 21 ¶¶ 38-48, 50, 52-59, 83; Doc. 58 at 3 ¶ 12; Doc. 58 at 13-20, 23-24 ¶¶ 38-48, 50, 52-59, 83.) The parties also dispute whether Mueller complained about her new position to her coworkers and whether her alleged negativity impacted the morale of her coworkers, including Bohardt. (Doc. 52 at 10-17 ¶¶ 38, 42, 44-46, 50, 52-56, 59; Doc. 58 at 13-20 ¶¶ 38, 42, 44-46, 50, 52-56, 59.)

Mueller learned she was pregnant in November 2018 but did not tell anyone at CWP until approximately January 2019; at that time, she began to tell some of her coworkers, including Bohardt. (Doc. 52 at 17-18 ¶¶ 62-64, 66; Doc. 58 at 3 ¶¶ 14-15; Doc. 58 at 20-21 ¶¶ 62-64, 66.) Two members of CWP's human resources team, Michelle Beagle

---

[3] Bohardt is referred to as "Trish" (Doc. 52 at 13 ¶ 46) and "Patrisha" (Doc 52 at 12 ¶ 43; Doc 58 at 10 ¶ 63).

("Beagle") and Linda Filep ("Filep"), spoke to Mueller about her pregnancy either in late January or early February 2019. (Doc. 52 at 19-20 ¶¶ 75-77; Doc. 58 at 4 ¶ 23; Doc. 58 at 23 ¶¶ 75-77.)[4] In late January 2019, Chimienti asked Mueller if she was pregnant. (Doc. 52 at 18 ¶ 67; Doc. 58 at 4 ¶¶ 19-21; Doc. 58 at 21 ¶ 67.) The parties dispute the tone and content of the resulting conversation. (Doc. 52 at 18 ¶ 67; Doc. 58 at 4 ¶ 19-20; Doc. 58 at 21 ¶ 67.) Mueller contends that Chimienti avoided her after learning she was pregnant. (Doc. 58 at 4, 21 ¶¶ 22, 67.)

On February 6, 2019—approximately two weeks after Chimienti asked Mueller if she was pregnant—Chimienti informed Vice-President of Human Resources Anna Zappia ("Zappia") that she had decided to terminate Mueller's employment. (Doc. 52 at 16-17 ¶¶ 59-61; Doc. 58 at 20 ¶¶ 59-61.) On the same day, Chimienti and Zappia notified Mueller of her termination. (Doc. 52 at 17 ¶ 60; Doc. 58 at 5 ¶ 31.) The parties dispute whether Chimienti fired Mueller because of her pregnancy or due to concerns regarding the effect of her purportedly negative demeanor on the work environment of her coworkers. (Doc. 52 at 16-19 ¶¶ 59-61, 68-69; Doc. 58 at 4-11, 20-22 ¶¶ 18-68, 59-61, 68-69.) The parties also dispute whether CWP supports pregnant employees. (Doc. 52 at 19 ¶¶ 71-74; Doc. 58 at 22-23 ¶¶ 71-74.)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.

---

[4] Mueller does not dispute Defendants' contention that Beagle and Filep spoke to her in late January 2019 about completing paperwork for her leave and expressed excitement for her. (Doc. 52 at 19-20 ¶¶ 75-77; Doc. 58 at 23 ¶¶ 75-77.) However, Mueller separately contends that Beagle and Filep commented on her pregnancy on February 5, 2019 and questioned her derisively about it. (Doc. 58 at 4 ¶ 23.)

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248-50 (1986); *see also Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In evaluating a motion for summary judgment, the court must "draw all reasonable inferences from the evidence" in favor of the non-movant. *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002). If "the evidence yields conflicting inferences, summary judgment is improper, and the action must proceed to trial." *Id.* "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

**III. Discussion**

    **A. Title VII Discrimination – Applicable Law**

Under Title VII of the Civil Rights Act, as amended by the Pregnancy Discrimination Act, it is unlawful to discharge an individual because of the individual's pregnancy. 42 U.S.C. §§ 2000e(k), 2000e-2(a)(1). Title VII pregnancy discrimination claims are analyzed under the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, the plaintiff carries an initial burden of establishing a prima facie case of discrimination. *Id.* at 802. If the plaintiff does so, a presumption of unlawful discrimination arises. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Once plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254. If the defendant does so, the burden shifts back

to the plaintiff to show that the defendant's stated reason for the adverse employment action is a pretext for unlawful discrimination—a burden that merges with the plaintiff's "ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 253, 256; *see also McDonnell Douglas*, 411 U.S. at 804.

### B.     Prima Facie Case of Pregnancy Discrimination

To establish a prima facie case, a plaintiff "must offer evidence that gives rise to an inference of unlawful discrimination." *Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010) (internal quotation and alteration marks omitted). The plaintiff may do so by offering evidence that shows (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) similarly situated employees outside her protected class were treated more favorably. *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 658 (9th Cir. 2002). Generally, "individuals are similarly situated when they have similar jobs and display similar conduct." *Hawn*, 615 F.3d at 1157 (internal quotation marks omitted). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine*, 450 U.S. at 253. At the summary judgment stage, the degree of proof required is minimal "and does not even need to rise to the level of a preponderance of the evidence." *Aragon*, 292 F.3d at 659 (internal quotation marks omitted); *see also Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986).

CWP does not dispute that Mueller has established the first and third prongs of the *McDonnell Douglas* framework: Mueller, as a pregnant woman, was a member of a protected class and suffered an adverse employment action when CWP terminated her employment. (Doc. 51 at 11.) However, CWP argues that Mueller cannot show that she was qualified for her position or that similarly situated employees were treated more favorably. (*Id.* at 11-13.) Specifically, CWP argues that Mueller failed to meet CWP's expectations due to her negative attitude and performance issues, and that she cannot prove that she performed well enough to rule out the possibility that she was fired for inadequate performance. (*Id.* at 11-12.) CWP further argues that Mueller has not identified any non-

pregnant employees with similarly negative attitudes and engagement levels who were treated more favorably. (*Id.* at 12-13.) CWP contends that the only employee identified by Mueller's interrogatory responses, Nora Heston (*see* Doc. 52-17 at 7), is not similarly situated because she works on the human resources team and is upbeat and encouraging to her coworkers. (Doc. 51 at 13.) In response, Mueller argues that she performed her job satisfactorily and her similarly situated, non-pregnant counterpart, Bohardt, was not terminated. (Doc. 57 at 8-9.) In reply, CWP argues that Bohardt is not similarly situated because she did not have the same attitude and performance problems as Mueller. (Doc. 60 at 6-7.)

Undisputed evidence shows that Mueller was qualified for her job in terms of education and experience. (Doc. 52-4 at 22, 26-27; Doc. 52-12 at 10; Doc. 58-3 at 10.) Furthermore, undisputed evidence shows that Mueller was, at the least, performing the baseline requirements for her position. (Doc. 52-4 at 21-22, 38, 40; Doc. 58-3 at 9-10; Doc. 58-4 at 9.) The record is devoid of any evidence of formal written evaluations, disciplinary notices, reprimands, or warnings documenting any problems with Mueller's job performance or attitude. (*See* Doc. 52-4 at 21, 23, 27; Doc. 58-3 at 9.) Nor is there any evidence that Chimienti or anyone else raised concerns about Mueller to the human resources department in the weeks leading up to Mueller's termination. (*See* Doc. 52-5 at 8-9; Doc. 52-18 at 7.)[5] It is undisputed that Mueller and Bohardt had the same job responsibilities. (Doc. 52-10 at 31; Doc. 52-12 at 6-10; Doc. 58-1 at 11.)

To support their position that Mueller was not qualified and not similarly situated to Bohardt, CWP relies upon declarations and deposition testimony indicating that Mueller displayed a negative attitude and failed to effectively communicate with the regional managers whom it was her job to support. (*See, e.g.*, Doc. 52-2 at 3-8; Doc. 52-4 at 21-23, 25-27, 31-42; Doc. 52-12 at 9-17; Doc. 52-15 at 2-3.) But Mueller testified at her

---

[5] Zappia contends that Chimienti raised concerns about Mueller in October 2018. (Doc. 52-5 at 15-16; *see also* Doc. 52-2 at 6.) Specifically, Chimienti was concerned that Mueller made more money than the rest of the team but seemed unwilling to make herself available after business hours. (Doc. 52-5 at 15-16; *see also* Doc. 52-2 at 6.) Even if this were true it does not relate to the reasons CWP gives for ultimately terminating Plaintiff in February 2019. (*See* Doc. 51 at 13-14.)

- 7 -

deposition that she was happy with her job and that she communicated with the regional managers based on their preferences of whether they wanted to be contacted via email, phone, or text. (Doc. 58-1 at 8-10.) Both Chimienti and Bohardt testified in their depositions about an incident on December 10, 2018, where Mueller failed to include an attachment in her weekly "Ops Connect" email to field leadership (Doc. 52-4 at 41-42; Doc. 52-12 at 18-19.) The incident is undisputed by Mueller. (Doc. 52-10 at 33-35.) However, the oversight was easily remedied by sending out the attachment within a few hours, this was a one-time occurrence, and there is no documentary evidence to support that anyone at CWP considered the December incident a significant matter when it occurred. (Doc. 52-10 at 33-34; Doc. 52-4 at 41-42.)

Ninth Circuit case law contains conflicting guidance regarding whether a plaintiff must present evidence eliminating the possibility that she was fired for inadequate job performance in order to establish a prima facie case of discrimination. In *Aragon*, the Ninth Circuit found that such a requirement would "conflate the minimal inference needed to establish a prima facie case with the specific, substantial showing [a plaintiff] must make at the third stage of the *McDonnell Douglas* inquiry." 292 F.3d at 659. However, in an earlier case, *Sengupta v. Morrison-Knudsen Co.*, the Ninth Circuit cited out-of-circuit authority for the proposition that a plaintiff must show, as one element of a prima facie case of discriminatory discharge, that "he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance." 804 F.2d 1072, 1075 (9th Cir. 1986); *see also Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 672 (9th Cir. 1988) (citing *Sengupta*). The analysis contained in *Aragon* is more detailed and is seemingly more consistent with Supreme Court precedent, which establishes that a plaintiff's burden at the first stage of the *McDonnell Douglas* framework is "not onerous." *Burdine*, 450 U.S. at 253. But even if a plaintiff must meet the standard identified in *Sengupta*, Mueller has met her burden of establishing a prima facie case for purposes of summary judgment because she has identified evidence raising a genuine issue of material fact regarding

whether she suffered from job performance and attitude issues.[6]

### C. Legitimate, Non-Discriminatory Reason

To meet its burden of proffering a legitimate, non-discriminatory reason for an adverse employment action, a defendant must "raise[] a genuine issue of fact as to whether it discriminated against the plaintiff" by presenting admissible evidence supporting a "legitimate, nondiscriminatory reason" for the adverse employment action. *Burdine*, 450 U.S. at 254-55. The defendant "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254.

CWP argues that it terminated Mueller's employment because Chimienti was concerned that Mueller's negative attitude would impact the morale and productivity of her team members. (Doc. 51 at 13-14; *see also* Doc. 51-2 at 6-8.)

An employer's concern that an employee's negative attitude would lower the morale and productivity of other employees is a legitimate, non-discriminatory reason for terminating an at-will employee. *See Stegall v. Citadell Broadcasting Co.*, 350 F.3d 1061, 1068 (9th Cir. 2003) (holding that an employee's negative attitude about her job is a legitimate, nondiscriminatory reason for termination). CWP has offered evidence supporting its position that Mueller was fired because Chimienti was concerned her negativity was impacting her team members. (*See, e.g.*, Doc. 52-2 at 3-8; Doc. 52-4 at 21-23, 25-27, 31-42; Doc. 52-12 at 9-17; Doc. 52-15 at 2-3; Doc. 52-13 at 2.)[7] Specifically,

---

[6] The parties' briefs focus on the above-discussed four-factor test for establishing a prima facie case. (*See* Doc. 51 at 11-13; Doc. 57 at 7-9.) The Court notes, however, that "the elements and contours of a prima facie case" may vary depending on the unique facts of a case, and a plaintiff may establish "an inference of discrimination in whatever manner is appropriate in the particular circumstances," *Hawn*, 615 F.3d at 1156, including by presenting "more direct evidence of discriminatory intent," *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). As discussed below, Mueller has presented at least some direct evidence of discriminatory motive, and the timing of her termination may also give rise to an inference of discrimination.

[7] CWP supports its position that Mueller displayed a negative attitude in part through evidence that Mueller complained regularly to her co-workers about her job. (Doc. 52-4 at 31-33; Doc. 52-12 at 11-16.) The Court notes that at least some of those complaints apparently related to concerns regarding unlawful employment practices. For example, Mueller expressed concerns to Bohardt that CWP would discriminate against her if she revealed she was pregnant. (Doc. 52-12 at 15; Doc. 52-14 at 3.) Mueller also expressed concerns regarding CWP's firing of one of her co-workers. (Doc. 52-12 at 13-14.) It is unlawful for an employer to fire an employee for expressing a reasonable belief that the employer is engaged in unlawful employment practices. *See* 42 U.S.C. § 2000e-3(a); *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983). Ultimately, there is no evidence that Bohardt told Chimienti about the concerns that Mueller expressed to her

Chimienti testified that she received numerous complaints about Mueller's negative demeanor, often from Mueller's coworkers who spoke to Chimienti in confidence. In one example, Courtney Steffensen raised concerns about Mueller with Chimienti. (Doc. 52-4 at 43-44.) Steffensen supervised Monica Hernandez, an employee who had transferred to the Tucson office in early 2019. (*Id.*) Steffensen, concerned that Mueller's negativity would impact Hernandez's performance, asked Chimienti if Mueller could be seated away from Hernandez. (*Id.*) In a second example, Leslie Thesing informed Chimienti that Mueller had made disparaging comments to and about Bohardt—specifically that Bohardt was "overeager and annoying." (Doc. 52-15 at 3.) CWP also proffers a November 5, 2018, text message between Chimienti, Lai, and CWP Vice-President Joe Matheny, where Lai seemingly observes that Mueller does not embody the company's spirit or culture. (Doc. 52-13 at 2.)

At this juncture, CWP's proffered reason—Mueller's alleged negative attitude—is sufficient to satisfy CWP's burden of providing a legitimate, non-discriminatory reason for Mueller's termination.

### D. Pretext

If the defendant articulates a legitimate nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the stated reason was in fact pretextual. *McDonnell Douglas*, 411 U.S. at 804. A plaintiff may demonstrate pretext in two ways: (1) directly, by showing that unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112–13 (9th Cir.2011). Where evidence of pretext is circumstantial, rather than direct, the plaintiff must produce "specific" and "substantial" facts to create a triable issue of pretext. *Id.* at 1113 (internal citations omitted). Where a plaintiff succeeds in raising a genuine issue of material fact regarding the authenticity of the employer's stated motive, summary judgment is

(Doc. 58-5 at 12-13), and thus Mueller's statements to Bohardt concerning CWP's employment practices apparently did not play a role in Chimienti's decision to fire Mueller.

inappropriate because it is for the trier of fact to decide which story is to be believed. *Washington v. Garrett*, 10 F.3d 1421, 1433 (9th Cir.1993).

Mueller argues that the record shows CWP's proffered explanation lacks credibility, and a discriminatory motive more than likely motivated CWP. (Doc. 57 at 11-13.) Moreover, Mueller argues that an inference of discrimination arises due to the temporal proximity between when Chimienti confirmed Mueller was pregnant and when Chimienti made the unilateral decision to terminate her. (*Id*. at 11-12.) CWP contends that there is no direct or circumstantial evidence that its proffered reason for Mueller's termination is pretextual. (Doc. 51 at 14-17.)

The Court agrees that Mueller has presented at least some direct evidence of pregnancy discrimination. Mueller testified at her deposition that, before she was hired, Chimienti asked her if she was planning to have any more children. (Doc. 52-10 at 13-14; Doc. 58-1 at 6.) Mueller further testified that when Chimienti asked her if she was pregnant, she did so in a derogatory tone and asked if she was hiding the pregnancy, whether she had planned it, and how much time she was planning to take off before abruptly ending the conversation and thereafter avoiding Mueller until her termination. (Doc. 52-10 at 48-49; Doc. 58-2 at 6-9.) Chimienti testified that she never asked Mueller if she planned to have more children and that she excitedly congratulated Mueller about her pregnancy. (Doc. 52-4 at 21, 28-29; Doc. 58-3 at 9, 13; Doc. 58-4 at 1.)[8] The trier of fact will need to resolve these material disputes of fact to determine whether Chimienti's conduct constitutes direct evidence of pregnancy discrimination.

Furthermore, there are material factual issues concerning whether circumstantial evidence raises an inference of discriminatory motive. Chimienti decided to terminate Mueller approximately two weeks after she confirmed that Mueller was pregnant. (Doc. 52-4 at 28, 37, 42-44; Doc. 52-10 at 50-51; Doc. 58-2 at 6, 11-12; Doc. 58-4 at 1, 6, 11-14.) A reasonable fact-finder could determine that this close temporal proximity raises an

---

[8] In addition, Mueller testified that Filep and Beagle asked her about the pregnancy in a derogatory manner, whereas Filep and Beagle testified that they were excited for Mueller. (Doc. 58-2 at 10; Doc. 52-18 at 7-8; Doc. 52-19 at 7-8.)

inference of discriminatory motive. *See Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) (temporal proximity between employer learning of pregnancy and termination of employment can support inference of nexus between pregnancy and termination); *Linder v. Pacific Dataware, Inc.*, 142 F.3d 444, at *1 (9th Cir. Apr. 22, 1998) (mem.) (where employee informed her employer of her pregnancy six hours before being fired, temporal proximity supported an inference of discrimination); *Medina v. Multaler, Inc.*, 547 F. Supp. 2d 1099, 1129 (C.D. Cal. 2007) (temporal proximity between date employer learned of pregnancy and adverse employment actions suggested discriminatory motive); *cf. Flores v. City of Westminster*, 873 F.3d 739, 749 (9th Cir. 2017) (temporal proximity can support inference of causal connection between protected activity and adverse employment action for purposes of retaliation claim).

Moreover, there are material factual disputes concerning whether CWP's proffered reason for Mueller's termination is credible. As discussed above, CWP submitted declarations and deposition testimony supporting its position that Mueller displayed a negative attitude and that her negativity was affecting her team members. (*See, e.g.*, Doc. 52-2 at 3-8; Doc. 52-4 at 21-23, 25-27, 31-42; Doc. 52-12 at 9-17; Doc. 52-15 at 2-3.) However, besides Chimienti, there are only two instances where the complaints about Mueller's negativity are corroborated directly by witness testimony or declaration. In the first instance, sometime in January 2019,[9] Leslie Thesing approached Chimienti regarding disparaging comments Mueller made about and to Bohardt. (Doc. 52-4 at 31-32; Doc. 52-15 at 3.) However, Thesing's complaint arose from a conversation she overheard. (Doc. 52-4 at 31-32; Doc. 52-15 at 3.) Thesing then relayed information to Chimienti without clarification or discussion with Mueller. (Doc. 52-4 at 31-32; Doc. 52-15 at 3.) Neither Thesing nor Chimienti approached Mueller or the other participants about the overheard remarks. (Doc. 52-4 at 32-33; Doc. 52-15 at 3.) In the second instance, Bohardt described Mueller's ongoing negativity while acknowledging that she served as Mueller's confidant. (Doc. 52-15 at 9-17.) Bohardt admits that she never told Chimienti or Zappia about the

---

[9] There is no listed date. Chimienti's Deposition states "It was sometime in January [2019]." (*See* Doc. 52-4 at 32.) Leslie's declaration, (*See* Doc. 52-15 at 3), likewise does not list a date.

- 12 -

criticisms Mueller shared with her until after Mueller's termination. (Doc. 58-5 at 12-13.)

The remaining complaints about Mueller's alleged negativity or its impact on the team is evidenced through Chimienti's self-serving testimony including: (1) where Courtney Steffensen requested that Mueller be seated away from her team member (Doc. 52-4 at 33); (2) where CWP's CEO John Lai observed that Mueller may not be a good fit (*Id.* at 34-35; Doc. 52-13 at 2); and (3) where Joe Matheny told Chimienti that Mueller looked miserable half the time (Doc. 52-4 at 36-37). Each of these instances is based on Chimienti's account of what other CWP employees told or texted her. CWP does not offer any affidavits or depositions directly from Courtney Steffensen, John Lai, or Joe Matheny. (*See* Doc. 52-1 at 1-2.)

Lastly, Mueller contradicted the allegations of negativity, (*see* Doc. 58-1 at 8-10), and so did human resources employee Jennifer Forster, who testified that Mueller smiled whenever she saw her and never displayed a negative demeanor in her presence (Doc. 58-7 at 11-12). Furthermore, Chimienti testified at her deposition that Mueller's negativity "hadn't even reached the impact for [her] team yet." (Doc. 54-4 at 37.) And the evidence indicates that when Chimienti fired Mueller, she told Meuller that she was a nice person and that people liked her—comments that seem to contradict CWP's proffered reason for the termination. (Doc. 52-4 at 43; Doc. 52-10 at 51; Doc. 58-2 at 12.) Aside from text messages between Lai, Matheny, and Chimienti sent on November 5, 2018—concerning Mueller not embodying the spirit of CWP (Doc. 52-13 at 2)—there is no written evidence documenting any concerns regarding Mueller's job performance, attitude, or level of engagement. In order to determine whether CWP terminated Mueller because of her purported negativity or because of her pregnancy, the fact-finder will need to weigh the credibility of conflicting witness testimony at trial.

All of these considerations, taken together, are sufficient to carry Mueller's burden to produce "specific" and "substantial" facts to create a triable issue of pretext. As such, summary judgment is inappropriate.

…

## IV. Order

Accordingly,

**IT IS ORDERED DENYING** Defendant CWP's Motion for Summary Judgment (Doc. 51).

**IT IS FURTHER ORDERED** that the parties shall file their Joint Proposed Pretrial Order within 30 days from the date of this order.

Dated this 17th day of September, 2021.

_____
Honorable John C. Hinderaker
United States District Judge